**SO ORDERED.**

**SIGNED this 27 day of June, 2008.**



JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| HEATH H. HAMPTON, | ) | Case No. 07-40605 |
| | ) | Chapter 7 |
|         Debtor. | ) | |
| _____ | ) | |
| CRAIG A. BUCL, YVONNE J. BUCL, BOBBY | ) | |
| J. MCCARLEY, SANDRA E. MCCARLEY, | ) | |
| WILLIAM S. BOWERS, TAMMY LYNN | ) | |
| BOWERS, DOYLE G. BOYD, HELEN L. | ) | |
| BOYD, DARRELL WILLSON and CAROLYN | ) | |
| WILLSON, | ) | |
| | ) | |
|         Plaintiffs, | ) | |
| | ) | |
|     v. | ) | Case No. 07-7083 |
| | ) | |
| HEATH H. HAMPTON, | ) | |
| | ) | |
|         Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM ORDER AND OPINION

This matter is under advisement after trial of Plaintiffs' Complaint to Determine Dischargeability of Debt owed by Debtor, Health Hampton,[1] pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6). At the trial, the Court judged the credibility of the witnesses, and has now made an independent review of applicable law. This is a core proceeding over which this Court has jurisdiction to enter a final order.[2]

## I.    FINDINGS OF FACT

Heath Hampton, Debtor and Defendant herein, along with several other individuals, formed an apparently loose arrangement whereby they would raise livestock, mostly goats and sheep, but also some cattle, on 13 different tracts of pasture land (which Debtor called "ranches") located in various Kansas counties. Before beginning this venture, Debtor's prior education and work experience consisted of obtaining an associate degree plus two more years in business school in the area of finance, then 12 years in the investment business, ending that profession in 2004 when he became a full time rancher. At the time Hampton left the venture, he claimed it was the fourth largest operating ranch in Kansas, with 42 miles of fenced pasture, 19 employees and nine active partners.

Debtor did business under at least seven different names, including Pathway Advisors, Inc., Pathway Outfitting & Ranching, Hampton-Holthaus Farms, Advisor Financing, Inc., Hampton & Hampton PA, Inc., Hampton Consulting Corp., and Strategic Future & Options, Inc. Pathway Advisors' letterhead noted that Debtor was its managing partner, and that this corporation was

---

[1] Although the caption of the case originally included various d/b/a entities for Heath Hampton, the Pretrial Order indicated that the Complaint was proceeding only against Defendant, Heath H. Hampton. In addition, Heather Hampton was dismissed as a party defendant from the action on November 26, 2007 (Doc. 28).

[2] 28 U.S.C. § 157(b)(2)(I) (core proceeding), 28 U.S.C. § 1334 and 11 U.S.C. § 523(c).

involved in "Investment Banking, Money Management & Consulting Services, and Corporate Ranching and Outfitting." No evidence was presented as to the organizational structure of Pathway Outfitting & Ranching, but some documents received in evidence reflected it had a Board of Directors. Many documents referenced that some or all of the Plaintiffs would become "partners" in Pathway Outfitting & Ranching as a result of their investment. Because the evidence of the exact structure used was unclear, the Court will loosely refer to the entities as "the venture" or "the partnership."

Beginning in April 2005, Debtor began selling "investments" in a "Joint Venture Livestock Contract," mostly under the name Pathway Advisors, Inc. A buyer would purchase a certain number of goats or sheep, for a prescribed cost, and the agreement would indicate what percentage of profits each would receive "net after all expenses." There was no evidence that Debtor had any relationship, longstanding or otherwise, with any of the Plaintiffs prior to the time they started investing in the venture. Debtor's brother, who did tax work for some of the Plaintiffs, introduced Debtor to those Plaintiffs, and in at least one and maybe more instances, the Plaintiffs Bucls introduced Debtor to other Plaintiffs, encouraging them to invest in the venture. The clearest evidence of this relationship was with the Plaintiffs Bowers.

All witnesses who testified in Plaintiffs' case in chief were party plaintiffs, and they all testified that Debtor, in trying to encourage them to invest in this livestock venture, did not advise of the risks of such investments, but instead only "stayed positive" and indicated he expected generous returns because of the strong market for sheep and goats, especially on the East coast. Several Plaintiffs testified Debtor suggested he thought they could make a 20-30% return on investment. Hampton apparently also indicated the investment could serve as a potential tax write-

3

off, but no one ever testified whether that was true, or whether these Plaintiffs ultimately received any tax benefits from their investments.

Plaintiffs Bucl purchased $20,000 worth of Boer goats, 40 sheep, and two guard dogs in April 2005, another $17,000 worth of goats in May 2005, and $20,000 in sheep and goats in August 2005. Plaintiffs McCarley purchased $5,500 in goats in April 2005, $10,800 in goats and sheep in June 2005, $5,350 in goats and sheep in July 2005, $9,118.34[3] in goats in September 2005, $2,500 in goats in January 2006, and $10,000 in March 2006.

Plaintiffs Boyd purchased $11,500 in goats in June 2005, and then six months later purchased another $13,700 in goats and sheep, in December 2005. They also invested $10,000 in a "Smart Note" in September 2005. Plaintiffs Willson purchased $10,000 in goats in July 2005. Finally, Plaintiffs Bowers purchased $87,858 in goats in March 2006, electing to use some money held in three trust accounts held in the name of their children[4] with the hope of achieving a better return than they were then obtaining.

Mr. Bucl testified that in 2005, he personally saw hundreds or even thousands of goats on the 13 pastures, but that there were fewer goats on those pastures by 2006. Debtor sent a few checks to some of the Plaintiffs early on, as return on investment, but the checks soon dried up. Notwithstanding that fact, the Bucls nevertheless continued to buy more livestock, as did the McCarleys and the Boyds, and the Bucls were happy enough with the investment and its returns that they tried to get others to invest, including the Bowers.

---

[3]Plaintiff McCarley held $10,209.27 in an individual retirement account, and elected to liquidate that account to make this purchase, resulting in $9,118.34 to invest, after taxes paid on the early withdrawal of money in that account.

[4]Ms. Bowers testified that they opted to invest some portion of their children's trust fund money in the livestock venture because "the stock market was crashing" and they hoped this would be a better investment than the stock market. She also said Debtor claimed her children "would be set for life" if they made the investment.

4

In addition to complaining that they did not get the return on investment they expected, Plaintiffs complained at trial that Hampton did not send them detailed information about the actual cost of the livestock purchased, the sales price for the livestock, or any other detailed accounting information about what was happening with the money invested. They admitted that Hampton did send them some electronic mail communications about the venture, including some articles about the market for the livestock, as well as occasional thank you notes for their investments. In addition, there was at least one annual meeting at which time Debtor made copies of bank statements available to Plaintiffs. Debtor was also not very good about returning phone calls to the investors, and apparently not a good record-keeper.

Debtor testified that he personally believed in the potential success of this venture, to the extent that he invested $400,000 of his own money in it, all of which he lost. In addition, he testified that he worked harder than anyone else to make this venture succeed, including routinely working 20 hour days. Other partners even told him that they needed to hire additional laborers, because they recognized he could not continue to work at that pace. There was no testimony to rebut this evidence. One other relevant piece of evidence going to Debtor's intent was that he was physically working in Oklahoma, installing fencing on a contract that Pathways had entered into, when he received word he had been terminated. Notwithstanding receipt of that news, he continued to finish the project, since "Pathways had already been paid for the fencing work." This obviously served to prevent another claim for damages against Pathways, that could have resulted in further losses to the investors, including these Plaintiffs.

Less than four months after the last of these purchases, to the Bowers, the Bucls called a meeting at their offices, inviting the other "partners" to attend. The group voted to terminate

5

Debtor's services as the managing partner. Soon thereafter, Carroll Bennett (an employee and perhaps a partner in the venture) picked up all the books and records of the venture from Debtor, and delivered them to Plaintiffs Bucls, who in turn gave them to their counsel. Debtor cooperated in the turnover of the records, and did not retain copies of these documents, but he did create an inventory of sorts immediately before or after he was terminated, listing all the animals, equipment, and real estate owned by the venture at that time. He testified that at the time he was terminated, there was considerable equity for the investors in land, equipment, and animals, and that if the assets had been properly marshaled and liquidated by whoever the remaining partners/investors put in charge, Plaintiffs would have received some undetermined return on investment.

At some point after Debtor was terminated, Debtor's brother apparently told at least one investor [Mr. Boyd] that all the animals had died. There was no evidence of when that conversation occurred, or when the animals purportedly died; Debtor testified he found this testimony incredible. No one who testified was able to indicate who was "in charge" of the animals, ranches, employees, or equipment of the venture after they terminated Debtor, and it appears no one was. The decision to terminate the existing manager, this Debtor, without making sure someone took his place likely contributed to the damages they ultimately sustained. No evidence was presented that what happened with the assets after Hampton was terminated could be blamed on him.

Along these same lines, the Court heard testimony that various partners and employees of the venture (including perhaps a J. Williamson, Daryl Brock, and/or Carroll Bennett) may have engaged in some self-help regarding certain animals—declaring the livestock to be their own, retaining the animals, selling them and retaining the proceeds for themselves, while other partners disputed their ownership in those animals. This confusion about which animals belonged to which

6

investors was clearly caused, at least in part, because Debtor had not properly ear-tagged the animals, so that the purchased animals could be clearly linked to a specific owner.

Debtor also testified that even after he had been terminated, he had faith there was equity available in the venture's property, and tried to persuade an investor from Chicago to infuse cash that would have resulted in a return to Plaintiffs of part or all of their investment. He further testified that some or all of the remaining investors declined to pursue that opportunity. This testimony was also unrebutted.

Almost no information about the financial acumen or educational levels of Plaintiffs was solicited, and thus the Court knows almost nothing about the relative sophistication of Plaintiffs regarding livestock investments. The Court was never told what investment knowledge any of these Plaintiffs had, or whether they understood the livestock business and its potential for return on investment. We learned that Mr. Bucl owned his own welding and fabrication business, but no other relevant background information was provided, although he and his wife knew enough to help in the physical care of the animals. No information about Ms. Bucl's background was provided.

We learned that Mr. McCarley was retired, but never learned from what profession he was retired. We learned Mr. Willson's occupation was as a registered nurse, but nothing else about him or his spouse. We learned Mr. Bowers was a realtor, and that Ms. Bowers may be in banking or may have previously been in banking. Finally, we learned only that Mr. Boyd was an insurance agent, but that is all we learned about these Plaintiffs' respective backgrounds.

There was also no evidence admitted at trial that Debtor had personally benefitted from this venture to the Plaintiffs' detriment. There was no dispute that he had lost money, personally, on the venture, and maybe more than all of the Plaintiffs combined. There was no evidence that Debtor

improperly took assets of the venture that did not belong to him, or otherwise lined his own pockets with Plaintiffs' investment contributions.

Finally, there was no evidence presented about the overall investment scheme from either an expert or someone with expertise about livestock ventures. No one testified what the "normal" return on investment typically was for livestock investments, which left this Court with absolutely no ability to judge whether Debtor's apparent representation that a 20-30% return on investment was likely was a reasonable prediction, or completely false or reckless. No evidence was presented about what the true cost of the livestock was at the time, or the cost of feeding and caring for the livestock prior to sale, which might have allowed the Court to see if Plaintiffs were being initially overcharged for the livestock. No evidence was presented about what others in the industry, and in this region, were earning from the sale of sheep and goats, which again would have allowed the Court to understand if Debtor was falsely representing the possibilities on return. Finally, no evidence was presented about the risks of such livestock ventures, so that the Court could evaluate whether Debtor's failure to explore those risks with investors resulted in his representations being false or reckless.

There was also a lack of evidence as to what role other members of the venture may have played in its ultimate demise. The evidence did show that money was infused into the venture, that prior to his termination Debtor was heavily involved in the day to day operations of the venture, and that the Plaintiffs do not believe any of the venture's assets remain, with most Plaintiffs recouping little of their investment, if any. However, there was no testimony as to what role other individuals, such as Carroll Bennett or Daryl Brock, had in the venture, and whether they may have been at fault, at least in part, for the final demise of this venture.

8

Additional facts will be discussed below, if necessary.

## II.    ANALYSIS

Plaintiffs filed this case seeking non-dischargeability of the debts[5] owed to them by Debtor pursuant to 11 U.S.C. § 523(a)(2)(A),[6] § 523(a)(4), and § 523(a)(6).  The Court will address each of these claims separately.

Before doing so, it is important to note that the purpose of bankruptcy is to allow a debtor to have a financial "fresh start."  However, the Bankruptcy Code does not provide a blanket fresh start for all debtors for all reasons.  In fact, § 523 provides an express list of debts that are nondischargeable in a Chapter 7 bankruptcy.  Section 523 balances the competing policies of allowing a fresh start while preventing a debtor from prospering from his own fraud.[7]

### A.    Standard of Review

The burden of proof rests with the party opposing the discharge.  Thus, in this case, the burden of proof, by a preponderance of the evidence, is on Plaintiffs.[8]  Discharge provisions are

---

[5]Plaintiffs did not actually establish at trial that there was, in fact, a debt owed to Plaintiffs by Debtor, or how much that debt might be.  There was evidence that Plaintiffs gave certain amounts to Debtor to purchase animals, and there was evidence that some Plaintiffs received some return on investment, especially at the beginning, but the Court never received evidence what net amount was ultimately owed to each Plaintiff by Debtor or the partnership.  There is a pending state court action that was stayed by virtue of the filing of this bankruptcy case, in which the same Plaintiffs seek to establish whether there is actually a debt owed by Debtor (and other defendants) to each of them and if so, in what amounts.  However, because Plaintiffs clearly intended to make a claim against Debtor for damages arising out of the operation of this venture, the Court will make a determination as to whether any potential debt is dischargeable based upon the actions complained of by Plaintiffs.  In doing so, the Court is not ruling on the issue of whether such a debt actually exists, only on whether such a debt would be dischargeable if proven in state court.

[6]This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective.  All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[7]*Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998).

[8]*See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge).  *See also In re Busch*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

9

strictly construed against the creditor and, because of the fresh start objectives of bankruptcy, doubt is to be resolved in the favor of debtors.[9]

> **B.** **Plaintiffs did not meet their burden of proving that Debtor engaged in conduct that would cause these debts to be non-dischargeable under § 523(a)(2)(A).**

Section 523(a)(2)(A) of the Bankruptcy Code provides an exception to discharge if a debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The creditor must prove, by a preponderance of the evidence, (1) that debtor made a false representation; (2) that the representation was made with intent to deceive the creditor; (3) that the creditor justifiably relied on this representation, and (4) that the creditor sustained a loss as a result of the false representation.[10] A debtor's intent to deceive a creditor in making false representations, within the meaning of the fraud discharge exception, may be inferred from the totality of circumstances, or from a knowingly made false statement.[11]

Intent to deceive may also be demonstrated by a defendant's reckless disregard for the truth or accuracy of his representations.[12] "The Court is mindful, however, that reckless disregard for the truth or accuracy of the representations as a basis for satisfying the intent requirement under 11

---

[9]*In re Sweeney*, 341 B.R. 35, 40 (10th Cir. BAP 2006) (citing *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

[10]*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[11]*Id.* at 1374.

[12]*In re Daviscourt,* 353 B.R. 674, 685 (10th Cir. BAP 2006) ("Intent to deceive under this subsection [§ 523(a)(2)(A) ] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth."); *In re McGuire*, 284 B.R. 481, 493 (Bankr. D. Colo. 2002) (noting that "the Tenth Circuit has held that a finding of reckless disregard may satisfy the scienter element" under § 523(a)(2)).

10

U.S.C. § 523(a)(2)(A) should be construed narrowly."[13]  There must be some indication as a whole

that "'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the

creditor.'"[14]  A debtor's silence regarding a material fact can constitute a false representation under

§ 523(a)(2)(A).[15]

Courts typically look for specific indicia of fraud, often referred to as "badges of fraud,"

when analyzing a case under § 523(a)(2)(A).[16]  However, when analyzing a case in light of these

badges of fraud, the Court must be mindful that the cases are peculiarly fact specific, and the

conduct in each case must be viewed individually.[17]

The Court finds, as more fully discussed below, that Plaintiffs failed to prove that Debtor

made statements that constitute a fraudulent misrepresentation or omission, that the Debtor acted

with the intent to deceive Plaintiffs, or that Plaintiffs' reliance on Debtor's representations was

justified.

      **1.**    **Plaintiffs failed to prove that Debtor made any fraudulent misrepresentation or omission.**

---

[13]*In re Abeyta*, ___ B.R. ___, 2008 WL 2001965, 4 (Bankr. D.N.M. 2008) (citing *In re McGuire*, 284 B.R. at 493 (Bankr. D. Colo. 2002)).

[14]*Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) *aff'd in part and vacated in part by* 35 Fed. Appx. 826 (10th Cir. 2002) (quoting 3 William L. Norton, Jr. Norton Bankruptcy Law and Practice 2d § 47:16, n.62 (1999) (citations omitted)).

[15]4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed. rev. 2008).

[16]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, whether the debtor obtained credit in order to purchase exempt property, whether the conversion occurred after entry of a large judgment against the debtor, whether the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and whether the conversion rendered the debtor insolvent.  *Cadle Company v. Stewart (In re Stewart*, 263 B.R. 608, 611 (10th Cir. BAP 2001)).

[17]*Id.*

11

After the trial, the Court understood that the only "fraudulent misrepresentations" that Plaintiffs are relying on is Debtor's alleged claim that they could expect a 20-30% return on investment, and Debtor's general statements that things "looked good" with the venture and that the market for animals was strong.[18]  Plaintiffs Bowers also claim that Debtor told them the company would pay for some future medical costs, or that health insurance would be available through the company in the future, for at least Ms. Bowers, who has some health issues that make her difficult to insure.  The "omission" Plaintiffs are apparently relying on is Debtor's failure to detail the potential risks of the investment.

In order for a statement to be considered fraudulent for purposes of § 523(a)(2)(A), the statement must represent past or current facts.[19]  Absent evidence that Debtor knew the statements to be false when made, or that Debtor had no intention of carrying out his promises when they were made, merely optimistic business projections do not constitute false pretenses.[20]  To be actionable, the representation must be one of existing fact and not merely an expression of opinion or expectation.[21]  "Also falling within the purview of nonactionable language are those statements

---

[18]Plaintiffs also repeatedly pointed out that Debtor called the venture a partnership, but failed to ever create and/or file any formal partnership papers with the State of Kansas.  This testimony appeared to be aimed at showing that Debtor promised to set up a partnership, but failed to do so.  However, a "partnership" in Kansas is defined as "an association of two or more persons to carry on as co-owners a business for profit formed under K.S.A. 56a-202, predecessor law, or comparable law of another jurisdiction."  K.S.A. 56a-101(f).  "[T]he association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership."  K.S.A. 56a-202.  A partnership agreement can be written, oral, or implied.  K.S.A. 56a-101(g).  Therefore, under Kansas law, it is clear that a partnership between Debtor and Plaintiffs existed, even if no formal partnership agreement was ever created.

[19]*See Matter of Allison*, 960 F.2d 481 (5th Cir. 1992).

[20]*Dimension Industries, Inc. v. Townsley (In re Townsley)*, 195 B.R. 54, 61 (Bankr. E.D. Tex. 1996).

[21]*Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991)

12

which amount to no more than sales 'puffery' upon which reliance should not be placed"[22]   A

debtor's misrepresentation of his intentions or opinions may constitute a false representation within

the meaning of § 523(a)(2)(A), but only if, when the representation is made, the debtor has no

intention of performing as promised or does not hold the expressed opinion.

The evidence presented was completely insufficient to establish that Debtor's statements

concerning the potential future rate of return on Plaintiffs' investments was fraudulent at the time

they were made.  First, there was no evidence what a "reasonable" rate of return would be, so from

the outset the Court had absolutely no frame of reference from which to determine if the estimates

were inflated.  Second, the mere fact that Debtor may have overestimated the potential rate of return

on the investments, or that he ultimately failed to fulfill the contractual obligations entered into with

Plaintiffs, is insufficient to constitute fraud, without some evidence that Debtor knew those

statements were false when he made them..

There was no evidence presented that Debtor did not intend to fulfill the obligations or that

he did not believe the projections he was making at the time these transactions took place.  Again,

Debtor may have been negligent in his handling of the transactions with Plaintiffs, but there is

insufficient evidence to show that he acted in any way fraudulently.

The representations made by Debtor to Plaintiffs Bowers concerning health insurance are,

similarly, not of the type sufficient to support a fraud claim.  Debtor's promise to provide this benefit

in the future can only be considered fraudulent in the context of § 523 if, at the time the promise was

made, Debtor knew it would not be fulfilled or had no intentions of ever fulfilling that promise.  The

evidence at trial did not support such a finding.  It is clear that this promise was not fulfilled, but

<hr>

[22]*Id.*

13

there was no indication that Debtor did not intend to follow through with this promise at the time it was made. Failing to fulfill contractual obligations is not, in and of itself, sufficient conduct to support a claim of fraud.[23]

There was also no evidence presented that Debtor knowingly withheld information about potential risks relating to these investments. Plaintiffs produced no evidence to show what risks were typically associated with this type of venture, or that Debtor was aware of these risks when he accepted their investments in the venture. The fact that Debtor should have generally been aware of certain risks, or should have done more research to discover potential risks, is insufficient to state a claim for fraud. Had Plaintiffs presented any evidence to show that Debtor actually knew about specific risks in this type of venture, and purposely concealed those risks in an effort to obtain their money, the result could have been different.[24]

Although not specifically raised by Plaintiffs, it appeared to the Court that Plaintiffs may also have been inferring that Debtor was engaged in some sort of illegal pyramid or Ponzi scheme, whereby new investors are obtained with promises of large rates of return, while the fresh money that is invested in the company is used to pay returns to prior investors in an effort to make it appear that the individuals running the scheme are fulfilling their promises. Typically these schemes are set up in a manner that if new investors do a limited amount of investigation, it will appear that the

---

[23]*See Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 676 (10th Cir. 2007).

[24]The Court also notes that there was no evidence that any money was lost as a result of any potential risk that Debtor knew about or should have known about. There was no evidence presented as to where the money or property might have gone, or that Debtor had any hand in the disappearance of any assets. The only evidence presented on that issue was when Debtor, who was proceeding pro se, in essence put himself on the stand to testify that at the time he was fired, all of the company assets were still in place.

14

investment scheme is legitimate. However, the evidence presented at trial was insufficient to show that such a pyramid scheme existed here.

The evidence showed that Debtor was personally involved in this venture, and invested—and lost—substantial amounts of his own money. There was undisputed evidence that a large number of animals were purchased, with several of Plaintiffs even taking part in personally working and caring for the livestock from time to time.[25] The testimony established that real estate was purchased, and improvements, including miles of fencing, were made on the properties purchased by the venture. The evidence in this case resembles that of a venture that was created with high hopes of quick money, built upon poor management and a lack of communication, which venture eventually failed for reasons that were not clearly shown at trial. Debtor's actions in that failed venture may have been negligent, but there was simply no evidence they were fraudulent.

Although these findings, alone, are sufficient to deny Plaintiffs' objection to discharge under § 523(a)(2)(A), the Court will also address the issue of the Debtor's intent to deceive as it relates to Plaintiffs' objection to discharge under § 523(a)(2)(A).

**2.      Plaintiffs failed to prove that Debtor acted with the necessary intent to deceive.**

Even if the Court were to have found that, by "staying positive" and not adequately detailing the risks of the investment, Debtor did make fraudulent misrepresentations, the Court would still reject Plaintiffs' claim that the debt at issue is non-dischargeable under § 523(a)(2)(A), because they

---

[25]Plaintiffs did present evidence that Debtor did not properly identify at least some of the individual animals by ear tagging them so that specific animals could be linked to specific investors. This led to later confusion when the venture started to fail, as no one was sure which animal had been purchased by which investor, and other partners started taking animals that may or may not have been theirs (without permission from Debtor). However, there was no evidence presented that this was done by Debtor in an effort to defraud Plaintiffs, or that the money provided by Plaintiffs was not in fact used to purchase the animals. It is just as likely, given the lack of evidence in this case, that the failure to properly tag the animals was a result of the continued mismanagement of this venture as it being a result of any fraudulent or improper conduct by Debtor.

failed to prove, by a preponderance of the evidence, that Debtor acted with the necessary intent. In addition to proving that Debtor made misrepresentations, Plaintiffs are required to show that Debtor did so with the intent to deceive them.[26] This intent may be inferred from the totality of the circumstances, or from a knowingly made false statement.[27]

Although the burden remains on Plaintiffs to show that Debtor acted with the required intent, the Court finds that Debtor himself was able to demonstrate, with his own uncontroverted and credible testimony, that he did not intend to deceive Plaintiffs. Again, Plaintiffs may have shown that the Debtor was negligent in failing to disclose potential risks (assuming he even knew the true risks—which evidence was not presented by expert or other testimony), and possibly that he, or the other individuals running the business, were negligent in the way the business was run, but negligence is clearly not enough to meet the strict requirements of § 523(a)(2)(A).

Further, Debtor testified that he fully intended at all relevant times to honor the agreements made regarding repayment, but that he was effectively prevented from doing so when the other partners voted in July 2006 to terminate him from management. He also testified that when he was ousted, he had made a full inventory of all the company's equipment, animals and land, but that these records were demanded—and he voluntarily turned them over—to Carroll Bennett, who in turn turned them over to Plaintiffs or their counsel.

He testified he did not retain copies, and that he never saw those records again. They were not produced by Plaintiffs at trial, although the uncontroverted evidence was that the evidence had been turned over to Plaintiffs. Ultimately, Debtor testified, and there was no contrary evidence, that

---

[26]*See Young*, 91 F.3d at 1373.

[27]*Id.* at 1375.

16

he believed (and still believes) that proper management of the assets would have been sufficient to repay the outstanding debt because there was extensive equity in real estate holdings and in equipment owned by the company.

Plaintiffs could also point to no evidence that Debtor used their money for his personal benefit—such as building an expensive home, buying new cars, or taking extravagant vacations. In fact, the only evidence presented on this issue—and again it remained unrebutted, was that before his termination, Debtor was personally working twenty hour days trying to make the venture succeed, and he actually lost $400,000 of his own money in the venture. This shows Debtor actually believed in the concept he was selling, which is the polar opposite of the allegation that he knew from the beginning that the venture was not going to make money. There is simply no evidence that Debtor had any intent to deceive Plaintiffs.

The Court believed Debtor's testimony that the money he received was invested back into the business, including payment of large labor costs (a large staff of hired hands who were trying to run what was the fourth largest ranch in Kansas), payment for what the other witnesses admitted were hundreds to thousands of goats that they personally saw on some or all of the pastures owned by the company, payment for the labor and materials that went into installing miles of fence to corral the animals until sale, and other necessary costs. The evidence at trial tended to show that Debtor used the money received from Plaintiffs for the purposes it was intended, and that he honestly, although perhaps foolishly, believed that the venture would be successful.

The Court is cognizant that Plaintiffs have claimed that Debtor did not keep adequate financial records, and that the lack of such records made presenting their case more difficult. However, Plaintiffs made no attempt to produce any other evidence supporting their claim that

17

Debtor acted improperly with funds entrusted to him for this venture. They produced no expert testimony on the typical costs and requirements for running an operation of the type or magnitude as in this case. They presented no evidence showing that money was being used for any improper purpose such as vacations, cars, homes, etc. for Debtor's personal benefit. Even when Debtor took the witness stand in his own defense, Plaintiffs were unable to illicit any evidence to show any improper use of funds.

Debtor testified that he turned over all of his financial records following his termination, and the evidence showed that those records are currently in the custody of some of the Plaintiffs, or their counsel. Debtor's lack of bookkeeping may have been negligent, but without more evidence than was presented in this case, Debtor's bookkeeping problem does give rise to a claim of fraud.

3.   **Plaintiffs failed to prove that they justifiably relied on Debtor's representations.**

Finally, because no evidence of the business, education, or experience backgrounds of Plaintiffs—at least as it related to their respective understanding of the business in which they were investing—was presented, the Court has no way to determine whether, even if Defendant made representations to them about return on investment that were inflated, Plaintiffs' reliance on those representations was reasonable. In other words, if an investor had previously invested in goats and sheep, and knew a reasonable profit was only 5%, that investor could not reasonably rely on a representation that a profit of 20-30% could be expected. Although the Court heard some evidence about the professions of some of the Plaintiffs, Plaintiffs did not meet their burden of proving that their reliance on Hampton's representations was reasonable. Accordingly, Plaintiffs have failed to prove that Debtor acted with an intent to deceive them. Therefore, its objection to discharge pursuant to § 523(a)(2)(A) is rejected on this basis, as well.

18

**C.**     **Plaintiffs did not meet their burden of proving that Debtor engaged in fraud or defalcation while acting in a fiduciary capacity that would render his debt to them non-dischargeable under § 523(a)(4).**

Section 523(a)(4) provides an exception to discharge from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiffs did not allege, in the Pretrial Order, which supersedes the pleadings, that Debtor embezzled funds or committed larceny, and they did not present any evidence or argument at trial of such conduct. Instead, they relied solely on that part of § 523(a)(4) concerning fraud or defalcation while acting in a fiduciary capacity.

To prevail under this provision of § 523(a)(4), Plaintiffs must first prove that a fiduciary relationship existed between each of them and Debtor. They must then prove that Debtor committed fraud or defalcation within the course of that fiduciary relationship.[28]

Although they never directly explained why they believed Debtors owed them a fiduciary duty, the testimony seemed to infer that they thought Debtor owed them a fiduciary duty merely as a result of his position as the managing partner of the venture, and because he was selling them an investment. The testimony also inferred their theory that Debtor breached the purported fiduciary duty owed to them by either not earning enough money to repay the money they invested, or by not keeping in better contact with them to explain the financial trouble he was experiencing with the venture.

Plaintiffs, relying solely on state case law, claim that a fiduciary relationship exists when there is "any blood, business, friendship or association in which one of the parties places a special trust and confidence in the other" and that to have a fiduciary relationship "there must also exist a certain

---

[28] *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Fowler Bros. v. Young*, 91 F.3d at 1371).

19

inequality; dependence, weakness of age, mental strength, business intelligence, knowledge of the facts involved, or other conditions giving to one an advantage over the other."[29]  The Tenth Circuit, whose decisions this Court must follow, has instead construed § 523(a)(4) rather narrowly.

In *Fowler Brothers v. Young (In re Young)*, the Tenth Circuit discussed breach of fiduciary duty as it relates to § 523(a)(4), as follows:

> The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law.  However, state law is relevant to this inquiry.  Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under §523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the Debtor.  Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4).  Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability.  Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy.[30]

Plaintiffs wholly failed to show that an express or technical trust was created, wherein they, or anyone else, entrusted Debtor with money to be held in trust.

Granted, state statutes often impose trusts on persons held to be fiduciaries as a matter of law, based on their relationships.[31]  A state statute must meet three requirements to trigger the fiduciary duty required by § 523(a)(4).  First, the trust *res* must be defined by the statute.  Second, the statute must identify the fiduciary duty.  Third, the statute must impose a trust on funds prior to the act creating the debt.[32]

---

[29]Plaintiffs cited *Olson v Harshman*, 233 Kan. 1055 (1983) for this proposition.

[30]*In re Young*, 91 F.3d at 1371-72 (citations and internal quotation marks omitted).

[31]*Employers Workers' Compensation Assoc. v. Kelley (In re Kelley)*, 215 B.R. 468, 473 (10th Cir. BAP 1997). *See, e.g.* K.S.A. 40-5002(m) (imposing a fiduciary duty upon a viatical settlement broker in favor of the viator).

[32]*In re Kelley*, 215 B.R. at 473.  *See also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934) (holding that "It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*.  He must have been a trustee before the wrong and without reference thereto.").

Plaintiffs failed to allege in the final Pretrial Order, or to argue in their trial brief or at trial, that any specific state statute provides such a statutory fiduciary duty in this case. Debtor may have owed some sort of general fiduciary duty to the company to use the money received from Plaintiffs for partnership purposes, but Plaintiffs failed to present any evidence that the money was not so spent. And there was no proof that Debtor owed any fiduciary relationship to any of the Plaintiffs prior to the creation of the debt in controversy.

Even if the Court were to find that the fiduciary duty owed by Debtor to the venture was sufficient to establish a claim under § 523(a)(4), the Court would still have to deny Plaintiffs' claim that the debt should be deemed non-dischargeable. That is because in addition to proving that a fiduciary relationship exists, Plaintiffs must also prove that the debt in question arose as a result of fraud or defalcation while Debtor was acting in that fiduciary relationship.[33] As previously noted, there was no evidence that Debtor used the funds received to pay anything other than company debts. There was no evidence that Debtor converted company assets to his personal use. And there was no evidence that he squandered the money received from Plaintiffs on frivolous items, or that he engaged in any specific conduct that created harm to the venture—other than not making the profit he and Plaintiffs had hoped would be made.

Because Debtor's alleged fiduciary duty runs to the venture, not to Plaintiffs, the Court finds that Debtor did not commit fraud or defalcation while acting as a fiduciary. Because Plaintiffs wholly failed to show that Debtor engaged in any conduct that could be considered fraud or defalcation

---

[33]*In re Kelley*, 215 B.R. at 473.

toward the venture, which is the alleged beneficiary of the fiduciary relationship, their objection to discharge is denied on this ground, as well.[34]

**D.    Plaintiffs failed to prove that Debtor engaged in conduct that would render his debt to them non-dischargeable pursuant to § 523(a)(6).**

Plaintiffs' final claim is that Debtor caused a willful and malicious injury to them, and as a result, the debt he or the venture owes them should not be dischargeable pursuant to § 523(a)(6). Section 523(a)(6) provides an exception to discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity." In 1998, the Supreme Court clarified, in *Kawaauhau v. Geiger*,[35] that § 523(a)(6) only applies to a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. The Court explained that this meant the debtor must have intended the consequences of the act he or she performed, not simply the act itself.[36] As noted by the Court of Appeals for the Tenth Circuit, without proof of *both* [a willful act and a malicious injury], an objection to discharge under § 523(a)(6) must fail.[37]

Plaintiffs wholly failed to show that Debtor committed a willful act or caused a malicious injury under the facts of this case. The injury to Plaintiffs that gives rise to its claim has been set out above. In essence, Plaintiffs tried to demonstrate that Debtor induced them to invest money in the venture by promising large rates of return on their investments, while failing to disclose the potential

---

[34]Although Debtor's fiduciary duty, if one existed, ran to the venture, the outcome would be no different if the fiduciary duty was owed directly to Plaintiffs. There was simply no evidence presented that showed, or even implied, that Debtor used the money entrusted to him for any purpose other than its intended purpose. Although courts may generally infer fraud or defalcation from the totality of the circumstances, there has to be at least some evidence presented that could lead a court to conclude that something improper took place. In this case, there was simply no such evidence presented.

[35]523 U.S. 57, 60-64 (1998).

[36]*Id.* at 61-62.

[37]*Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (emphasis in original).

22

risks associated with that investment. But because there was no evidence of what a reasonable rate of return should have been, or what risks were known or should have been known by Hampton, they did not prove Debtor's actions were willful or malicious.

In addition, while Plaintiff's evidence did show that the money they invested in the venture has disappeared, there was no evidence presented that the money was used for any purpose other than for what it was intended—purchasing, raising and caring for livestock, along with purchasing and making improvements to real estate necessary for the venture's purposes. Finally, there was testimony that established Debtor did not provide Plaintiffs with complete records of the venture's finances—but again there was no evidence presented that this was done in an attempt by Debtor to mislead Plaintiffs or to cause them to lose their investments. Instead, what was more credible was Debtor's testimony that he was a poor good bookkeeper, and that he did not have enough assistance to properly run this business.

There was no evidence presented that Debtor willfully intended for Plaintiffs to lose their investments or that he acted maliciously towards them in any way. In fact, the only evidence before the Court shows the opposite is true. First, he had invested over $400,000 of his own money in the venture, so he had every incentive to make a profit. He was unable to do so and even had to file for bankruptcy. Second, Debtor testified in a credible fashion that he had every hope of returning profits to Plaintiffs, pursuant to their agreements, but that the financial failure of the venture caused him to be unable to make good on the agreements. He even contacted a potential purchaser for the venture—even after he was terminated—who was supposedly willing to purchase the assets with the hope of making a return of some or all of the parties' investments. This did not result in any return to Plaintiffs, but does tend to show his good faith. The Court finds Debtor's testimony on this subject

23

to be credible and uncontroverted. Because Plaintiffs did not show that Debtor intended to cause the injury to them, or that he acted maliciously, their § 523(a)(6) objection to discharge is denied.

## III.   CONCLUSION

The Court conducted a trial of this matter, which permitted the Court to judge the credibility of the numerous witnesses. Unfortunately, at least in part because the Debtor appeared *pro se*, the evidence presented was not at all clear. In addition, Plaintiffs' counsel seemed to be under the impression that this proceeding was nothing more than a necessary first step to allowing him to conduct a more complete presentation of evidence in state court, where Plaintiffs have a pending action against Debtor and others. Counsel treated this action as if it was a motion for relief from stay, which would enable him to more fully produce evidence in state court, if Plaintiffs prevailed on their request to be allowed to return to state court, rather than as a Complaint to Determine the Dischargeability of debts for which Plaintiffs had to meet their burden of proof before this Court.

For example, Plaintiffs expressly elected not to seek a judgment for money damages against Debtor in this Court, explaining in their trial brief that they were "not asking the Court to award damages," but only to "deny discharge so they may have their day in court, where Defendant, and others associated with him, will have the opportunity to answer for their actions."[38] This <u>was</u> there day in court.

Further evidence of counsel's apparent misunderstanding of what Plaintiffs had to prove before this Court, in order for the Court to be able to find that Plaintiffs' claims were nondischargeable, came in closing argument, where he stated that Plaintiffs "wouldn't be here today" if Debtor had just kept in closer touch with them about the business and provided them "more

---

[38]Doc. 44.

24

information about why their investments had not made the money they all hoped they would." The Court does not doubt the fact that Debtor did not keep Plaintiffs as informed as they should have been or as they desired, or that there was poor management of this venture. In fact, Debtor himself admitted to mismanagement of the venture while on the witness stand. However, poor management and a lack of communication are insufficient bases to bring a claim under §§ 523(a)(2)(A), (a)(4) or (a)(6). Each of those exceptions to discharge require a much greater level of culpability than Plaintiffs proved in this case.

The Court finds that whatever debts Defendant, Heath Hampton, owed to each Plaintiff are dischargeable, as they do not fall within any of the exceptions to discharge raised by Plaintiffs. Plaintiffs failed to prove by a preponderance of the evidence that the debt in question was obtained by false pretenses, false representations or actual fraud, as required by § 523(a)(2)(A). In addition, Plaintiffs failed to prove that the debt in this case was for fraud or defalcation while acting in a fiduciary capacity as required by § 523(a)(4), or that the debt was for willful and malicious injury by Debtor as required by § 523(a)(6). For these reasons, the Court finds that judgment should be entered in favor of the Debtor, and against Plaintiffs, and that the debts owed to Plaintiffs are in fact dischargeable.

**IT IS, THEREFORE, BY THIS COURT ORDERED** that judgment shall be entered in favor of the Debtor, Heath Hampton, and against Plaintiffs, Craig A. Bucl, Yvonne J. Bucl, Bobby J. McCarley, Sandra E. McCarley, William S. Bowers, Tammy Lynn Bowers, Doyle G. Boyd, Helen L. Boyd, Darrell Willson and Carolyn Willson on their Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523.[39]

---

[39]Doc. 1.

**IT IS FURTHER ORDERED** that whatever debt is owed by the Debtor to each Plaintiff herein is dischargeable in this bankruptcy case.

**IT IS FURTHER ORDERED** that the foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure.  A judgment based on this ruling will be entered on a separate document as required by Fed. R. Bankr. P. 9021 and Fed. R. Civ. P. 58.

# # #